**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| BAY PLAZA PROPERTIES, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 08-189 |
| vs. | ) | |
| | ) | Hon. Judge Lawrence M. Baskir |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | ADR Judge: Marian Blank Horn |
| Defendant. | ) | |

---

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

---

MARK F. (THOR) HEARNE, II
LINDSAY S.C. BRINTON
MEGHAN S. LARGENT
Lathrop & Gage, LC
10 South Broadway, Suite 1300
St. Louis, MO 63102-1708
314.613.2500 (Phone)
314.613-2550 (fax)
Thornet@ix.netcom.com
ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS

Page


I. **SUMMARY OF THIS MOTION** .......... 10

II. **SUMMARY OF UNDISPUTED FACTS** .......... 12

A. In 1910, eight property owners granted the Seaboard Air Line Railway ("Seaboard") easements for a right-of-way upon which to operate a railroad across their property. These easements expressly limited the right to use the property to the operation of a railroad. It was on the basis of these grants of an easement that the Seaboard constructed the approximately twelve and one-half mile long railroad line between Sarasota and Venice, Florida. .......... 12

1. How The Right-of-Way Was Established .......... 12

2. How the Seaboard Air Line Right-of-Way was Used and Ultimately Transferred To The CSX and SGLR .......... 14

B. The Plaintiffs are the successors in title to the original property owners that granted the rights-of-way to Seaboard; all of the Plaintiffs held fee title to their property abutting and underlying the former Seaboard right-of-way on April 2, 2004. .......... 15

C. Seaboard's successor railroad, CSX and Seminole Gulf Railroad, LP, ("SGLP") abandoned the railroad easement in 2004 .......... 15

D. On April 2, 2004, the Surface Transportation Board ("STB") issued a Notice of Interim Trail Use or Abandonment ("NITU") which precluded the Plaintiffs' reversionary rights to their property, converted the abandoned railroad right-of-way into a public-access recreational trail, and imposed an easement for future possible railroad across the Plaintiffs' property. .......... 16

III. **Partial Summary Judgment Is Appropriate Under Rule 56 RCFC** .......... 20

IV. **Summary Judgment Rests Upon Well-Settled Principles of Law** .......... 21

A. The Federal Trails Act operates to preclude or preempt the abandonment and reversion of a railroad right-of-way that would have otherwise occurred by operation of state law. .......... 21

1. Congress Intended the 1983 Trails Act Amendments to Preclude Property Owners' "Reversionary" Rights Under State Law .......... 21

a. The Trails Act Amendments of 1983 Were Adopted to Prevent Abandonment of Railroad Rights-of-Way that Would Otherwise be Abandoned Under State Law....................... 21

b. The Supreme Court's Landmark Decision in Preseault v. United States Found The Trails Act To be Constitutional But Required the Payment of "Just Compensation" When the Trails Act "delay[s] (or Burdens) Property Owners' Enjoyment of Their State Law Reversionary Interests."............... 22

c. The Settled Law After Preseault I is that State Law Determines the Nature of a Property Interest Subject To the Trails Act and When the Owner's Enjoyment of that interest is Delayed or Burdened, "Just Compensation" is Due............................................................................................ 25

i. The U.S. Federal Circuit Has Held that The Federal Government is Obligated to Pay "Just Compensation" in Similar Trails Act Taking Cases.......... 26

ii. U.S. Court of Federal Claims Has Held that The Federal Government is Obligated to Pay "Just Compensation" in Similar Trails Act Taking Cases.......... 29

iii. U.S. District Courts in Trails Act Takings Claims Brought Under the "Mini-Tucker" Act Have Held the Defendant Liable to Pay Compensation for a Taking of Property.......................................................... 31

d. A Taking of the Property Owner's Land Arises Upon Issuance of a NITU.................................................................... 32

B. The rights that property owners enjoy in their property are defined by state law. ............................................................................................................ 33

C. Under Florida law, a railroad easement is abandoned when the property is no longer used for a railroad purpose; a "railroad purpose" does not include a public-access recreational trail........................................................... 33

1. An Easement is not an estate in land but merely the right to use property for a specific purpose. ............................................................. 35

2. The terms of an easement are governed by the unambiguous intention of the parties. ......................................................................... 36

3. The easement holder may only use the property for the specific purpose designated in the grant of the easement...................................... 37

4. An easement holder may not increase the burden upon the property....37

5. A Railroad easement is extinguished and abandoned when the property is conveyed to a non-railroad or used as a hiking trail....38

6. An easement may be abandoned, extinguished or forfeited....40

7. When a railroad easement is abandoned, the underlying property owners enjoy the property free of any easement....40

D. When the Trails Act precludes a property owner from enjoying that owner's "reversionary" right to property, which the owner enjoys under state law, it is a per se taking of that property owner's land for which the Fifth Amendment requires the federal government to pay "just compensation"....41

1. When the Trails Act precludes a property owner's "reversionary" right to property, it is a taking that requires payment of "just compensation" to the property owner....41

2. Precluding a property owner's "reversionary" rights to use and enjoy their property and imposing further burdens on the property for an easement for a public-access recreational trail, as well as a future easement for railroad use, is a substantial per se physical taking of that property owner's property....42

V. CONCLUSION....45

APPENDIX....Appendix i

Appendix 1: Description of the Plaintiffs; Property....Appendix ii

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Ackers v. Canas*,
601 So.2d 305 (Fla. App. 1992) ....37

*American Real Estate Holding Limited Partnership v. Twin Cities Investors, Inc.*,
740 So. 2d 562 (Fla. App. 1999) ....36

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986) ....20

*Armstrong v. United States*,
364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) ....42

*Barclay v. U.S.*,
127 S.Ct. 1328 (U.S. Feb. 20, 2007) (No. 06-816) ....33

*Barclay v. United States*,
443 F.3d 1368 (2006) ....32, 33

*Beres v. United States*,
64 Fed. Cl. 403 (2005, Judge Horn) ....31

*Bird Bay v. United States*,
No. 07-429 ....15, 20

*Blendu v. United States*,
75 Fed. Cl. 543 (2007, Judge Hewitt) ....31

*Board of Regents v. Roth*,
408 U.S. 564 (1972) ....33

*Boyd v. U.S.*,
116 U.S. 616 (1886) ....44

*Brower v. County of Inyo*,
489 U.S. 593 (1989) ....44

*Caldwell v. United States*,
391 F.3d 1226 (Fed. Cir. 2004) ....32, 33

*Cannco Contractors Inc. v. Livingston*,
282 Ark. 438, 669 S.W.2d 457 (railroad deeding of right-of-way constituted abandonment), modified, 282 Ark. 438, 670 S.W.2d 454 (1984) ....39

*Celotex Corporation v. Cattrett*,
477 U.S. 317 (1986) ....................20

*Clear Channel Metroplex, Inc. v. Sunbeam Television Corp.*,
922 So.2d 229 (Fla. App. 2005) ....................37

*Dean v. MOD Properties, Ltd.*,
528 So. 2d 432 (Fla. App. 1988) ....................35

*Drazich v. Lasson*,
964 P.2d 324 (Utah App. 1998)....................36

*Easton v. Appler*,
548 So.2d 691 (Fla. App. 1989) ....................35

*Ellamae Phillips Co. v. United States*,
77 Fed. Cl. 387 (2007, Judge Baskir) ....................31

*Entick v. Carrington 19 Howell's State Trials 1029*,
95 Eng. Rep. 807 (C.P. 1765)....................44

*Glosemeyer v. United States*,
45 Fed. Cl. 771 (2000)....................passim

*Grantwood Village v. United States* ....................29, 34, 45

*Harvest Queen Mill & Elevator Co. v. Sanders*,
370 P.2d 419 (Kan. 1962)....................36

*Hash v. United States*,
403 F.3d 1308 (Fed. Cir, 2005) ....................passim

*Hayes v. Reynolds*,
132 So.2d 781 (Fla. App. 1961) ....................35

*Huff v. Langman*,
646 N.E.2d 730 (Ind. App. 1995)....................36

*Hynes v. City of Lakeland*,
451 So. 2d 505 (Fla. App. 1984) ....................36

*Illig v. United States*,
58 Fed. Cl. 619 (2003)....................30, 45

*International News Service v. Associated Press*,
248 U.S. 215 (1918) ....................43

*Kaiser Aetna et al. v. United States*,
444 U.S. 164 (1979) ....................43

*Kempfer v. St. Johns River Water Management Dist.*,
475 So.2d 920 (Fla. App. 1985) ....................35

*Lawson v. State*,
107 Wash.2d 444, 730 P.2d 1308 (1986) ....................38, 39

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ....................43, 44

*Love v. U.S.*,
889 F. Supp. 1548 (E.D.N.C. 1994) ....................36

*Loveland v. CSX Transp., Inc.*,
622 So.2d 1120, 122 (Fla.App. 1993) ....................38, 40, 41

*Marthens v. B & O Railroad*,
170 W.Va. 33, 289 S.E.2d 706 (1982) ....................38

*Moore v. United States* ....................29, 37, 45

*Nat'l Assoc. of Reversionary Property Owners v. Surface Transp. Bd.*,
158 F. 3d 135 (D.C. Cir. 1998)....................32

*National Wildlife Federation v. ICC*,
271 U.S. App. D.C. 1, 11-12, and n. 16, 850 F.2d 694 (1988)....................25, 39

*Nature Conservancy v. Kolb*,
853 S.W.2d 864 (Ark. 1993) ....................40

*Oregon v. Elstad*,
470 U.S. 298 (1985) ....................20

*Pennsylvania Coal Co. v. Mahon*,
260 U.S. 393, 416, 43 S.Ct. 158, 67 L.Ed. 322 (1922)....................42

*Pollnow v. Department of Natural Resource*,
276 N.W. 2d 738 (1979)....................39

*Portsmouth Co. v. United States*,
260 U.S. 327 (1922) ....................43

*Preseault v. United States*,
100 F.3d 1525 (Fed.Cir.1996) (*en banc*) [(*Preseault II*) ....................passim

*Preseault v. United States*,
494 U.S. 1 (1990) ....................passim

*Rogers v. United States*,
No. 07-27 ....................15, 20

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ....................25, 33

*Schmitt v. United States*,
203 F.R.D. 387 (S.D. Ind., 2001) ....................31

*Schnabel v. County of DuPage*,
428 N.E.2d 671 (1981) ....................39

*Sears Roebuck and Co. v. Franchise Finance Corp. of America*,
711 So. 2d 1189 (Fla. App. 1998) ....................35

*Seventy-Ninth Street Improv. Corp. v. Ashley*,
509 S.W.2d 121 (Mo.1974)....................38, 39

*Shiner v. Baita*,
710 So. 2d 711 (Fla. App. 1998) ....................36

*Silverman v. United States*,
365 U.S. 505 (1961) ....................44

*Swisher v. United States*,
176 F. Supp.2d 1100 (D. Kan, 2001)....................32

*Toews v. United States*,
53 Fed. Cl. 58 (2002)....................27, 42, 43

*Towes v. United States,*
376 F. 3d 1371 (2004) ....................passim

*United States v. Causby*,
328 U.S. 256 (1946) ....................43

*United States v. Lefkowitz*,
285 U.S. 452 (1932) ....................44

*Walters v. McCall*,
450 So.2d 1139 (Fla. App. 1984) ....................37, 38

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
449 U.S., at 164 *Preseault I*, 494 U.S. at 23....................25, 33

*Wiggins v. Lykes Bros.*,
97 So.2d 273 (Fla. 1957) ....................40

*Zoltek Corp. v. U.S.*,
442 F.3d 1345 (2006) ....................20

**Statutes**


16 U.S.C. § 1247(d) ........................................ 30

28 U.S. C. § 1346 (a)(2) ........................................ 31

Homestead Act of 1862 ........................................ 28

Pub. L. 98-11, 97 Stat. 48, to the National Trails System Act, Pub. L. 90-543, 82 Stat. 919 (codified, as amended, at 16 U.S.C. §1241 et seq. (Supp. II 1996) ........................................ 10

Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), Pub. L. 94-210, 90 Stat. 144, as amended, 49 U.S.C. 10906 (1982 ed.) ........................................ 24, 27

Tucker Act, 28 U.S.C. § 1491(a) ........................................ 20


**Other Authorities**


Gregg M. Turner, *A Short History of Florida Railroads*, Arcadia Publishing, 2003 ........................................ 12

Gregg M. Turner, *Railroads of Southwest Florida*, Arcadia Publishing, 1999 (pages 20-26) ........................................ 12

Jon. W. Bruce and James W. Ely, Jr., The Law of Easements and Licenses in Land ¶ 8.02[1], at 8-3 (rev. ed. 1995) ........................................ 37


**Rules**


RCFC 56 ........................................ 10, 20

RCFC 56(c) ........................................ 20

## I. SUMMARY OF THIS MOTION

This case is a claim by thirty-two property owners[1] seeking "just compensation" that they are due under the Fifth Amendment for the federal government's taking of their property. The property consists of thirty-seven parcels of land in Sarasota County Florida. The federal government took their property when Section 8(d) of the 1983 amendments to the federal National Trails System Act ("Trails Act")[2] precluded their "reversionary"[3] rights to their property, which they enjoyed under Florida law, and imposed two new easements upon their property, one easement for a public-access recreational trail, and a second easement for use of the Plaintiffs' property in the future as a railroad. The Plaintiffs have filed this motion pursuant to RCFC 56 requesting that this Court enter partial summary judgment against the Defendant on the issue of the government's liability for this taking of the Plaintiffs' property.

Summary judgment should be entered under RCFC 56 and against the Defendant on the basis of four essential and undisputed facts and four points of settled law.

The four undisputed facts are:

(1) In 1910, eight property owners granted the Seaboard Air Line Railway ("Seaboard") easements for a right-of-way upon which to operate a railroad across their property. These easements expressly limited the right to use the property to the operation of a railroad. It was on

---

[1] Several of the property owners are husband and wife, or a husband and wife's living trust. We group these together as a common owner for purposes of this memorandum.

[2] Pub. L. 98-11, 97 Stat. 48, to the National Trails System Act, Pub. L. 90-543, 82 Stat. 919 (codified, as amended, at 16 U.S.C. §1241 et seq. (Supp. II 1996)).

[3] Plaintiffs use the term "reversionary" or "reversion" in this memorandum in the generic sense to describe the Plaintiff's property interest. We employ the term in this generic sense because it is commonly used in this manner by courts considering Trails Act taking cases. This is not a technically correct use of the term. As the Federal Circuit has noted, "as a matter of traditional property law terminology, a termination of the easements would not cause anything to "revert" to the landowner. Rather, the burden of the easement would simply be extinguished, and the landowner's property would be held free and clear of any such burden." *Towes v. United States,* 376 F. 3d 1371, 1376 (2004).

the basis of these grants of an easement that the Seaboard constructed the approximately twelve and one-half mile long railroad line between Sarasota, Florida and Venice, Florida.

(2) The Plaintiffs are the successors in title to the original property owners that granted the rights-of-way to Seaboard. Each of the Plaintiffs held fee title to their property abutting and underlying the former Seaboard right-of-way on April 2, 2004.

(3) Seaboard's successor railroad, CSX and Seminole Gulf Railroad, LP, ("SGLP") abandoned the railroad easement in 2004.

(4) On April 2, 2004, the Surface Transportation Board ("STB") pursuant to the Trails Act issued a Notice of Interim Trail Use or Abandonment ("NITU") which precluded the Plaintiffs' reversionary rights to their property, converted the abandoned railroad right-of-way into a public-access recreational trail, and imposed an easement for future possible railroad across the Plaintiffs' property.

<u>The four points of settled law are</u>:

(1) The Trails Act operates to preclude or preempt the abandonment and reversion of a railroad right-of-way that would have otherwise occurred by operation of state law.

(2) The rights that property owners enjoy to their property are defined by state law, in this case Florida law.

(3) Under Florida law and the terms of the instruments that created the railroad right-of-way easement, a railroad easement is abandoned when the property is no longer used for a railroad purpose; a "railroad purpose" does not include a public-access recreational trail.

(4) When the Trails Act precludes a property owner from enjoying that owner's "reversionary" right to property, which the owner enjoys under state law, it is a *per se* taking of

that property owner's land for which the Fifth Amendment requires the federal government to pay "just compensation."

On the basis of these four uncontested facts and four points of well-settled law, judgment should be entered against the Defendant on its obligation to pay "just compensation" for the taking of Plaintiffs' property when the Trails Act precluded the Plaintiffs from enjoying their reversionary rights to property they owned under Florida law and imposed upon that property an easement for a public-access recreational trail and an easement for a possible future railroad.

## II. <u>Summary of Undisputed Facts</u>

### A. In 1910, eight property owners granted the Seaboard Air Line Railway ("Seaboard") easements for a right-of-way upon which to operate a railroad across their property. These easements expressly limited the right to use the property to the operation of a railroad. It was on the basis of these grants of an easement that the Seaboard constructed the approximately twelve and one-half mile long railroad line between Sarasota and Venice, Florida.

1. <u>How The Right-of-Way Was Established</u>

The history of the Seaboard Air Line Railway from Sarasota to Venice, Florida line is recounted in *Railroads of Southwest Florida*, which states as follow:

> Bertha Honore Palmer [a wealthy and prominent Chicago widow] chartered a Pullman car and came to Sarasota from Chicago in 1910. So impressed with the region, she purchased more than 60,000 acres of land, much of it bay front, including what is now Venice Beach. But the sale hinged on the Seaboard [Air Line Railway] extending itself from Sarasota to Venice.
>
> [Ms. Palmer] convinced the Seaboard to extend its track south of Fruitville to Venice, where she owned extensive land holdings. Work commenced on the 16-mile extension in January 1910, by way of Osprey and Laurel. The project was completed in fall, 1911.[4]

[4] Gregg M. Turner, *Railroads of Southwest Florida*, Arcadia Publishing, 1999 (pages 20-26). *See also*, Gregg M. Turner, *A Short History of Florida Railroads*, Arcadia Publishing, 2003. "At the behest of Bertha Honore Palmer – a wealthy Chicago widow who was developing much of what became Sarasota County – the Seaboard broke ground on a 16-mile extension south of Fruitville to Bee Ridge, Laurel, and Venice, which opened in the fall of 1911." *See id* at 102.

The Palmer family, including Bertha Honore Palmer's son, Potter Palmer, Jr., and her brother, Adrian C. Honore, granted the Seaboard Air Line Railway easements to use their property for the construction and operation of a railroad.[5] The easements expressly conditioned the use of the property for the creation and operation of a railroad. The easements provided,

> [the grantors] hereby remise, release and forever quitclaim unto the SEABOARD AIR LINE RAILWAY, a corporation of the State of Virginia and other States; a **right-of-way for railroad purposes** over and across the following described parcel of land.
>
> ***
>
> This conveyance is made upon the express condition, however, that if the Seaboard Airline Railway shall not construct upon said land and commence the operation thereon with (sic) one year of the date hereof of a line of railroad, or, **if at any time thereafter the said Seaboard Air Line Railway shall abandon said line for railroad purposes then the above described pieces and parcels of land shall *ipso facto* revert to and again become the property of the undersigned, his heirs, administrators and assigns.**[6]

These easements from the Palmer family, as well as a similar easement conveyed by Sarah O. Webber,[7] were the instruments by which the Seaboard Air Line Railway acquired the vast majority of the right-of-way between Sarasota and Venice, Florida – estimating at more than 132 out of a total of 155 acres.[8] The remaining portion of the right-of-way was created by six easements granted by other land owners for the express purpose of a railroad right-of-way.[9]

---

[5] See easement conveyances by Adrian C. Honore and Potter Palmer, Jr. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraphs 2 and 6, and Tab 1 and Tab 2).

[6] *Id.*

[7] The Webber deed contains the following conditional language, "[i]t is understood and agreed that if the said premises shall hereafter be abandoned by the said party of the second part its successors or assigns for railroad purposes in that event the said premises shall *ipso facto* revert to the party of the first part whereas executors, administrators, and assigns." (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph 10, and Tab 3).

[8] The Quit Claim Deed from CSX to The Trust for Public Land indicates that the abandoned right-of-way converted to trail use covered approximately 155 acres. *See*, Plaintiff's Proposed Findings of Uncontroverted Fact, paragraph 143, and Tab 115. Of this 155 acres, approximately 3.1 were owned by Sarah O. Webber, 1.15 by Potter Palmer, Jr., *Et Ux*, and approximately 128 acres were owned by Adrian C. Honore. (*See* Plaintiffs' Proposed Findings of Uncontroverted

2. <u>How the Seaboard Air Line Right-of-Way was Used and Ultimately Transferred To The CSX and SGLR</u>

The Seaboard Air Line Railway did not enjoy great success over this route and ultimately suffered a receivership, bankruptcy and was forced to merge with their competitor the Atlantic Coast Line.[10] In the years since World War II, and especially since the 1950's, various segments of the railroad corridor were abandoned.[11] The combined Seaboard Atlantic Coast Line was finally acquired by the CSX.[12] The CSX, in turn, found the route unprofitable and sold it to a shortline, the Seminole Gulf Railroad L.P.[13] The SGLP likewise found the line unprofitable and in 2004 abandoned the railroad corridor between Sarasota and Venice.[14] A more detailed

---

Fact, paragraphs 5, 9, and 12, and Tabs 1-3. Mr. Honore's property was divided into 4 sections: 22.5 acres, 20.5 acres, 80.76 acres, and 4.6 acres. This calculation of acreage is derived from the legal descriptions in the four conveyance documents. (The figure of 80.76 was calculated by multiplying the length of the right-of-way strip (35,180 feet) by the width (100 feet) and dividing this number (3,518,000) by 43,560.17 feet (the number of square feet in an acre)).

[9] The six other easement conveyances are:

(1) Easement granted by H.M. Frazee and his wife, Bertie Frazee, to Seaboard Air Line Railway Company, signed September 5, 1910. (*See* Proposed Findings of Uncontroverted Fact, paragraph 14, and Tab 4).

(2) Easement granted by Clement Phillips and his wife, Lula Phillips, to Seaboard Air Line Railway Company, signed September 5, 1910. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph 15, and Tab 5.

(3) Easement granted by Jesse Knight to Seaboard Air Line Railway Company, signed September 3, 1910. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph 16, and Tab 6).

(4) Easement granted by Jesse Knight and F.R. Knight to Seaboard Air Line Railway Company, signed September 3, 1910. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph 17, and Tab 7).

(5) Easement granted by J.B. Hutchings and Lena Hutchings to Seaboard Air Line Railway Company, signed September 29, 1910. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph 18, and Tab 8).

(6) Easement granted by A.E. Blackburn, Et Ux to Seaboard Air Line Railway Company, signed September 5, 1910. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph 19, and Tab 9).

[10] *Railroads of Southwest Florida*, *supra*, note 4.

[11] *Id.*

[12] Id.

[13] Id.

[14] Id.

explanation of this period of decline is included in the Plaintiffs' Memorandum in Support of their Motion for Partial Summary Judgment in *Rogers v. United States*, No. 07-27, and *Bird Bay v. United States*, No. 07-429.

**B. The Plaintiffs are the successors in title to the original property owners that granted the rights-of-way to Seaboard; all of the Plaintiffs held fee title to their property abutting and underlying the former Seaboard right-of-way on April 2, 2004.**

The Plaintiffs are a group of thirty-two individuals, businesses, and associations that own thirty-seven parcels of property in Sarasota County, Florida.[15] Each of the plaintiffs own fee title to property that was once encumbered by an easement granted to the Seminole Gulf Railway, L.P. ("SGLR") for the limited purpose of operating a railroad across this land. By reason of the Trails Act, the Plaintiffs' property is now subject to an easement for interim public-access recreational trail and possible future railroad reactivation.[16]

**C. Seaboard's successor railroad, CSX and Seminole Gulf Railroad, LP, ("SGLP") abandoned the railroad easement in 2004.**

"On December 15, 2003, Seminole Gulf Railway, L.P. ("SGLR"), filed with the Surface and Transportation Board ("STB") a petition under 49 U.S.C. 10502 for exemption from the provisions of 49 U.S.C. 10903 to abandon an approximately 12.43-mile portion of its Venice Branch between milepost SW 892 outside the city limits of the City of Sarasota, and milepost 904.4 near the City of Venice, in Sarasota County, FL."[17] The STB noted that this "line does not contain federally granted rights-of-way."[18]

On February 13, 2004, the STB found as follows:

---

15 The Sarasota County Appraiser assigns each parcel of real estate a unique "Parcel ID" number. We reference these numbers as a convenient means to identify the property involved in this case. Several of these parcels are contiguous or adjoining parcels.

16 *See* Appendix 1 for a fuller description of each property owner, how they acquired their land, and each property owner's title as of April 2, 2004.

17 STB, Docket No. Ab-400 (Sub-No. 3x), January 2, 2004 decision. *See* Plaintiff's Proposed Findings of Uncontroverted Fact, paragraph 129, and Tab 109.

18 *Id.*

> no traffic has moved over the line during 2003 or during the last nine months of 2002. The last delivery to a shipper via the line was on March 14, 2002. During the first three months of 2002, SGLR delivered 20 cars of plywood and lumber to a single customer (Kimal Lumbar) at a team track located on the line, where the freight was transloaded to a truck. . . . only three other customers have received traffic over the line in the last several years, but none have received any cars since May 2001.[19]

The STB later stated that, "there have been no rail movements over the last three miles of the line for over 10 years. . . .[SGLR] contends that there is little likelihood of traffic returning to the line and that there is interest in developing the right-of-way for trail use."[20]

**D. On April 2, 2004, the Surface Transportation Board ("STB") issued a Notice of Interim Trail Use or Abandonment ("NITU") which precluded the Plaintiffs' reversionary rights to their property, converted the abandoned railroad right-of-way into a public-access recreational trail, and imposed an easement for future possible railroad across the Plaintiffs' property.**

On the basis of these findings that the right-of-way was no longer being used for railroad service, the STB found that, "SGLR states that it and CSXT have granted The Trust for Public Lands an option to acquire the line for conversion to a trail. . . . On January 20, 2004, [Sarasota] County filed a request for interim trail use/rail banking under the [Trails Act]."[21] Accordingly, the STB issued the NITU on April 2, 2004.[22] The Public Trust for Land agreed to work with Sarasota County to covert the abandoned right-of-way into a public-access recreational trail.[23]

The STB ordered that,

> [b]ecause the County's request complies with the requirements of 49 CFR 1152.29, and SGLR is willing to enter negotiations, a NITU will be issued as requested. The parties may negotiate an agreement during the 180-day period prescribed below. If an agreement is executed, no further Board action is

---

[19] STB Docket No. Ab-400 (Sub-No. 3x), February 13, 2004 decision. *See* Plaintiff's Proposed Findings of Uncontroverted Fact, paragraph 131, and Tab 110.
[20] STB Docket No. Ab-400 (Sub-No. 3x), April 2, 2004 decision (Notice of Interim Trail Use or "NITU"). *See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph 132, and Tab 111.
[21] *Id.*
[22] *Id.*
[23] STB's February 14, 2004 decision, supra, note 19.

> necessary. If no agreement is reached within 180 days, SGLR may fully abandon the line.[24]

The Trust for Public Land is a tax-exempt public charity and Sarasota County is a municipality.[25] Neither is a railroad and neither Sarasota County nor the Trust for Public Lands possesses the legal authority to operate a railroad.[26]

On October 14, 2004, the STB granted a ninety day extension to the negotiating period and ruled, "The NITU negotiating period is extended until December 28, 2004."[27] On December 20, 2004, a Quit Claim Deed was executed by CSX Transportation (Inc.) conveying to the Trust for Public Land whatever interest CSX may have held in the abandoned right-of-way.[28] This Quit Claim Deed, which affects approximately 156 acres of property in Sarasota County, Florida, was recorded on January 13, 2005 and was expressly executed in reliance upon the STB's issuance of the NITU and provisions of the Trails Act.[29] The Quit Claim Deed specifically provides that the Grantor, CSX Transportation, Inc.,

> does hereby RELEASE, REMISE and forever QUITCLAIM unto [The Trust for Public Land], its successors and assigns, all right, title and interest of [CSX], if any, in and to those certain tracts of parcels of land situate, laying and being in Sarasota, Florida . . . TO HAVE AND TO HOLD the Premises, and all the estate, right, title, lien, interest and claim whatsoever of [CSX] therein, either in law or equity, and all improvements thereon and appurtenances thereto, unto the proper use, benefit and enjoyment of [The Trust for Public Land], [it's] heirs and assigns or successors and assigns, forever.

The Quit Claim Deed further provides that:

---

[24] STB's NITU, *supra*, note 20.
[25] *See* the website for The Trust for Public Land: http://www.tpl.org/tier2_sa.cfm?folder_id=170 (print-out attached as Tab 112); *see also* the website for Sarasota County: http://www.scgov.net (print-out attached as Tab 113).
[26] *Id.*
[27] STB Docket No. AB-400 (Sub-No. 3X), October 13, 2004 decision, *See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph 141, Tab 114.
[28] A copy of this Quit Claim Deed is attached as Tab 115.
[29] *Id.*

> [b]y Decision and Notice of Interim Trial Use or Abandonment served April 2, 2004 in the Surface Transportation Board ("STB") Docket No. AB-400, Sub.-No.3X, the STB imposed a Notice of Interim Trail Use ("NITU") on the Premises. [The Trust for Public Land] for itself, its successors and assigns, acknowledges that the Premises remain subject to the jurisdiction of the STB for purposes of reactivating rail service.[30]

Pursuant to the Quit Claim Deed, the SGLR (and CSX) conveyed whatever interest they may have had in the railroad right-of-way to The Trust for Public Land.[31] The Trust for Public Land has subsequently sold this property to Sarasota County for use as a public-access recreational trail.

Since April 2004, the approximately twelve and one-half mile long former SGLR railroad right-of-way has been transformed into a public-access recreational trail called "The Legacy Trail."[32] The railroad rails and ties have been removed from the former right-of-way and Sarasota County has graded the majority of the former roadbed for use as a public-access recreational trail.[33] Sarasota County states that the Legacy Trail will eventually be comprised of a 14-foot wide asphalt trail, rest-stop shelters, and additional entries into local neighborhoods.[34] According to The Trust for Public Land, the Legacy Trail will be "the centerpiece of [Sarasota] county's planned trail system and a major bicycle/pedestrian commuter link between Sarasota and Venice."[35]

---

[30] *Id.*

[31] *Id.*

[32] *See* the website for Sarasota County: http://www.scgov.net/PublicWorks/ RailsToTrails/ Rails.asp; a copy of this website print-out is attached as Tab 116.

[33] *See id.*, *see also* photographs of the trail construction posted on the Sarasota County website at: http://www.scgov.net/PublicWorks/RailsToTrails/Photos.asp, collectively attached as Tab 117.

[34] *See Tab* 116, website for Sarasota County.

[35] *See* the website for The Trust for Public Land: http://www.tpl.org/ tier3_cd.cfm?content_item_id=19837&folder_id=250; a copy of this website print-out is attached as Tab 118.

The Plaintiffs have never received "just compensation" for this taking of their property and the federal government has never offered to pay the Plaintiffs any compensation for this taking of their property.

## III. PARTIAL SUMMARY JUDGMENT IS APPROPRIATE UNDER RULE 56 RCFC

On March 20, 2008, the Plaintiffs filed this action seeking "just compensation" for the taking of their property. The Fifth amendment is self-executing.[36] This Court has jurisdiction to hear such a claim pursuant to the Tucker act.[37]

The Plaintiffs have filed this motion for partial summary judgment on the question of the government's liability for a taking of their property in violation of the Fifth Amendment pursuant to Rule 56 RCFC. The Plaintiffs have requested that this case be transferred to Judge Williams and consolidated for decision on the question of liability with the companion class action case, *Rogers v. United States*, and the non-class action, *Bird Bay v. United States*. All three of these cases involve the same NITU and the same railroad corridor.

Summary judgment motions isolate and eliminate factually unsubstantiated cases and are appropriate in cases when the pleadings, depositions, formal discovery requests, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[38] A "genuine issue" of fact exists only if a "reasonable jury" could find in favor of the non-moving party.[39]

As Plaintiffs demonstrate below, there are no genuine issues of material fact and this Court should enter summary judgment finding that the federal government, by operation of the Trails Act and the STB's issuance of a NITU, has precluded the Plaintiffs' reversionary property rights and has burdened the Plaintiffs' property with two new easements without paying "just compensation," in violation of the Fifth Amendment to the U.S. Constitution.

---

[36] *Oregon v. Elstad*, 470 U.S. 298, 350 (1985); *Zoltek Corp. v. U.S.*, 442 F.3d 1345, 1376 (2006).
[37] Tucker Act, 28 U.S.C. § 1491(a).
[38] RCFC 56(c); *Celotex Corporation v. Cattrett*, 477 U.S. 317, 323 (1986).
[39] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

## IV. Summary Judgment Rests Upon Well-Settled Principles of Law

### A. The Federal Trails Act operates to preclude or preempt the abandonment and reversion of a railroad right-of-way that would have otherwise occurred by operation of state law.

#### 1. Congress Intended the 1983 Trails Act Amendments to Preclude Property Owners' "Reversionary" Rights Under State Law

##### *a. The Trails Act Amendments of 1983 Were Adopted to Prevent Abandonment of Railroad Rights-of-Way that Would Otherwise be Abandoned Under State Law*

The unfortunate financial plight of the Seaboard Air Line Railway was not unique. As Justice Brennan recounted in his introduction to the Court's opinion in *Preseault v. United States*, 494 U.S. 1 (1990) (*Preseault I)*, Congress became concerned about the nation's loss of railroad right of way. Justice Brennan summarized the legislative history underlying the 1983 Trails Amendments to the Trails Act in *Preseault I*, 494 U.S. at 5.

As Justice Brennan noted, it was Congress's intent to create a result under federal law (preservation of a railroad corridor for future railroad use and interim public recreational trail use) that was not possible under existing state law. Congress did this by preempting or precluding the abandonment of railroad rights-of-way under state law. This intent to preclude state law abandonment of railroad corridors was why Congress in 1983 adopted section 8(d) of the Trails Act to provide, "that interim trail use 'shall not be treated, for any purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.'"

The United States Congress has made clear that the 1983 Amendments to the Trails Act were intended to pre-empt state law and that when they did, "just compensation" would be paid to property owners. Congressmen Barr, Chairman of the House Judiciary Sub-Committee holding hearings into the Trails Act noted,

> [a]t first glance, it may appear Congress did not consider the fact that if the railroad land was not transferred in fee simple it may belong to the property