> owner, and not the railroad. However, *Congress intended the railbanking aspect of this Federal law would preempt State law and hold the land essentially in perpetuity, until possible rail reactivation.* In the 1996 *en banc* decision in *Preseault v. United States*, involving the same plaintiffs as in the Supreme Court case I just mentioned, the U.S. Court of Appeals for the Federal Circuit held that railroad abandonment constituted a *per se* taking, and therefore would require payment of just compensation to the affected land owners, under the Fifth Amendment.[40]

Thus, while Congress intended to take a perpetual easement over the property owners' land, Congress also understood and intended that these land owners would be paid "just compensation."

b. *The Supreme Court's Landmark Decision in Preseault v. United States Found The Trails Act To be Constitutional But Required the Payment of "Just Compensation" When the Trails Act "delay[s] (or Burdens) Property Owners' Enjoyment of Their State Law Reversionary Interests."*

The Preseaults owned fee title to land underlying an abandoned railroad easement in Vermont.[41] The railroad was converted to interim trail use by the ICC's issuance of a Notice of Exemption pursuant to the Trails Act.[42] The Preseaults challenged this action by claiming that Congress's preemption of state law by passing the Trails Act was an act beyond Congress's constitutional authority.[43] The Preseaults contended that the Trails Act preemption of the rights they enjoyed in their property under Vermont law violated the Commerce Clause and the Fifth Amendment.[44] The Supreme Court held that the Trails Act amendments were not an unconstitutional act by Congress but a constitutional exercise of eminent domain by Congress.[45] The Court further held that, to the extent the Trails Act preempted any property owner's

---

[40] United States House of Representatives, Judiciary Committee, Subcommittee on Commercial and Administrative Law, "*Litigation and Its Effect on the Rails-to-Trails Program*," June 20, 2002. (emphasis supplied).
[41] *Preseault v. United States*, 494 U.S. 1, 9 (1990).
[42] *Id.*
[43] *Id.* at 10.
[44] *Id.*
[45] *Id.* at 17-19.

reversionary right to their property enjoyed under state law, the federal government was required to pay "just compensation."[46] The Supreme Court then held that the Tucker Act provided this Court with jurisdiction to award "just compensation" when the Trails Act worked such a taking.[47] As the Court recognized,

> This language [the 1983 Trails Act Amendment] gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests . . . .[48]

The Court noted Congress's intent to preclude the right of property owners to their property under state law, stating that,

> The key finding of this amendment is that interim use of a railroad right-of-way for trail use, when the route itself remains intact for future railroad purposes, shall not constitute an abandonment of such rights-of-way for railroad purposes. This finding alone should eliminate many of the problems with this program. The concept of attempting to establish trails only after the formal abandonment of a railroad right-of-way is self-defeating; once a right-of-way is abandoned for railroad purposes there may be nothing left for trail use. This amendment would ensure that potential interim trial use will be considered prior to abandonment.[49]

As the legislative history quoted by Justice Brennan notes, the "problems with the program" prior to the 1983 Amendment were that under state law a "railroad purpose" did not include "railbanking" or "interim trail use" and the fee owners of the property regained their

---

[46] *Id.*
[47] *Id.*
[48] *Id.* at 8. Florida courts have also noted what Justice Brennan observed, namely that most railroads do not own fee title to their rights-of-way but only hold an easement to use the property for a right-of-way. "The [Florida] Telegraph Act [which allowed telegraph lines to be located in railroad rights-of-way] would have been entirely futile if it depended on the assumption that all Florida railroads had obtained their rights-of-way years before in fee simple title. Except to site a station house or similar land use here and there, the railroads had no need or desire for any interest except 'right-of-way.'" *Davis v. MCI*, 606 So 2d 734, 738 (Fl. App., 1992).
[49] *Preseault*, supra, note 63, at 9, *citing* H. R. Rep., at 8-9.

right to the property when railroad service was abandoned.[50] As Justice Brennan observed, "because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. *** [and] frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations."[51]

Congress's intent to preserve these otherwise abandoned railroad corridors was being frustrated by state law. So, Congress adopted the 1983 amendments to preclude the operation of state law. This preclusion or forestalling of state law property rights is what gives rise to a Fifth Amendment taking claim.

"The Commission's actions may delay property owners' enjoyment of their reversionary interests, but that delay burdens and defeats the property interest rather than suspends or defers

---

[50] The word "abandonment" is a term of art in the context of railroad real estate title and regulation. "Abandonment" is used in very different ways depending upon the context. There are two contexts in which the same word "abandonment" is used.

First, "abandonment" is used in the context of state real estate law to refer to the loss of a railroad's right to use specific real property for the operation of a railroad. A railroad's right to use specific property is defined by the real estate and property law of the relevant state. If a railroad holds only an easement to use the property for a specific purpose – which is customarily the manner in which railroads obtained the right to use property for operation of a railroad – this right can be lost by being "abandoned". Whether the railroad has "abandoned" its right to use the real property is determined by reference to the relevant state's real estate law. "Many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests." *Preseault,* supra, note 63, at 8.

The second use of "abandonment" is in the context of federal regulation of interstate railroads. (*See*, Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), Pub. L. 94-210, 90 Stat. 144, as amended, 49 U.S.C. 10906 (1982 ed.) In this context the term "abandonment" refers not to the railroad's title or interest in the real estate over which it provides railroad service but to the obligation of the railroad to provide interstate railroad service over a given corridor or route. A railroad may not cease, or "abandon", its obligation to provide railroad service over a given railroad corridor without first obtaining the permission of the STB to terminate such interstate railroad service.

[51] *Preseault*, supra, note 63, at 9.

the vesting of those property rights."[52] Any other conclusion would convert the ICC's power to pre-empt conflicting state regulation of interstate commerce into the power to pre-empt the rights guaranteed by state property law, a result incompatible with the Fifth Amendment. *See Ruckelshaus v. Monsanto Co.*, 467 U.S., at 1012 ("If Congress can `pre-empt' state property law in the manner advocated by EPA, then the Taking Clause has lost all vitality. [A] sovereign, `by *ipse dixit*, may not transform private property into public property without compensation . . . . This is the very kind of thing that the Taking Clause of the Fifth Amendment was meant to prevent'"), quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S., at 164 *Preseault I*, 494 U.S. at 23. (concurring opinion of O'Connor).

c. *The Settled Law After Preseault I is that State Law Determines the Nature of a Property Interest Subject To the Trails Act and When the Owner's Enjoyment of that interest is Delayed or Burdened, "Just Compensation" is Due.*

The settled law after the U.S. Supreme Court's decision in *Preseault* was described succinctly by the Federal Circuit, "[i]n *Preseault [I]*, the Court held that if abandonment of railway use and application of the Trails Act effects a taking when the easement would otherwise revert to the owner of the servient estate, the landowner may sue for compensation under the Tucker Act. 494 U.S. at 4-5, *** *See also Preseault v. United States,* 100 F.3d 1525 (Fed.Cir.1996) (*en banc*) [(*Preseault II*)] (applying state law of reverter to determine rights of the owner of the servient estate)." *Hash v. United States*, 403 F.3d 1308 (Fed. Cir, 2005).

We noted above Justice Brennan and Justice O'Connor's direction that state law defines the nature and extent of any property interest taken by application of the Trails Act. This has been followed by the Federal Circuit, this Court, and district courts, in cases finding that the

---

[52] See *National Wildlife Federation v. ICC*, 271 U.S. App. D.C. 1, 11-12, and n. 16, 850 F.2d 694, 704-705, and n. 16 (1988).

Trails Act and the ICC's (now STB's) issuance of a NITU took an interest in a property owner's land.

i. *The U.S. Federal Circuit Has Held that The Federal Government is Obligated to Pay "Just Compensation" in Similar Trails Act Taking Cases*

The Federal Circuit has repeatedly held that when the Trails Act precludes a property owner from regaining the "reversionary" rights that the owner possesses under state law, it is a taking of the owner's property for which the federal government must pay "just compensation."

In *Preseault II,*[53] the Federal Circuit identified two alternative means by which the Trails Act had taken the landowner's interest in their property. Judge Plager wrote,

> [I]f the Preseaults have interests under state property law that have traditionally been recognized and protected from governmental expropriation, and if, over their objection, the Government chooses to occupy or otherwise acquire those interests, the Fifth Amendment compels compensation. The record establishes two bases on which the Preseaults are entitled to recover. One, if the [recreational trail] easements were in existence in 1986 when, pursuant to ICC Order, the City of Burlington established the public recreational trail, its establishment could not be justified under the terms and within the scope of the existing easements for railroad purposes. The taking of possession of the lands owned by the Preseaults for use as a public trail was in effect a taking of a new easement for that new use, for which the landowners are entitled to compensation. As discussed previously, some courts consider that the establishment of a use outside the scope of an existing easement has the effect of causing an abandonment, and thus termination, of the existing easement. Either way, the result is the same-a new easement for the new use, constituting a physical taking of the right of exclusive possession that belonged to the Preseaults.
>
> Two, as an alternative basis, in 1986 when the ICC issued its Order authorizing the City to establish a public recreational biking and pedestrian trail on Parcels A, B, and C, there was as a matter of state law no railroad easement in existence on those parcels, nor had there been for more than ten years. The easement had been abandoned in 1975, and the properties were held by the Preseaults in fee simple, unencumbered by any former property rights of the Railroad. When the City, pursuant to federal authorization, took possession of Parcels A, B, and C and opened them to public use, that was a physical taking of the right of exclusive

[53] *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. en banc 1996).

> possession that belonged to the Preseaults as an incident of their ownership of the land.[54]

More recently, the Federal Circuit affirmed Judge Bruggink's decision in *Toews v. United States*, 53 Fed. Cl. 58 (2002). The government appealed Judge Bruggink's decision. The Federal Circuit rejected the government's argument on appeal and noted,

> [t]he Government contends that, as a matter of California law, use of these railroad rights of way for railbanking and interim use as a recreational trail did not go beyond the scope of the easements. Further, it is the Government's view that, under California law, there was no abandonment or extinguishment of the easements caused by the federal actions under § 8(d) of the National Trails System Act. And thirdly, the Government states that these questions should not be subject to decision by the federal courts but should be referred to the California courts for resolution.[55]

The Federal Circuit rejected all three of the government's contentions. The Federal Circuit reaffirmed the analysis to be applied in a Trails Act taking as follows:

> It is elementary law that if the Government uses (or authorizes the use of-a point to be considered later) an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use. The consent of the railroad to the new use does not change the equation-the railroad cannot give what it does not have.
>
> And it appears beyond cavil that use of these easements for a recreational trail-for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway-is not the same use made by a railroad, involving tracks, depots, and the running of trains. The different uses create different burdens. In the one case there was an occasional train passing through (no depots or turntables or other appurtenances are involved on these rights of way). In the other, individuals or groups use the property, some passing along the trail, others pausing to engage in activities for short or long periods of time. In the one case, the landowner could make such uses of the property as were not inconsistent with the railroad's use, crossing over the tracks, putting a fruit stand on one edge of the property, or whatever. In the other, the government fenced the trail in such a way as to deny that access.
>
> Some might think it better to have people strolling on one's property than to have a freight train rumbling through. But that is not the point. The landowner's grant authorized one set of uses, not the other. Under the law, it is the landowner's

---

[54] *Id.* at 1551.

[55] *Towes v. United States* 376 F.3d 1371, 1375 (2004).

> intention as expressed in the grant that defines the burden to which the land will be subject.[56]

*Towes* is especially relevant to the immediate case because, as in *Towes*, the terms of the grant of the relevant railroad easement to Seaboard are clearly and expressly limited to use of the property for the purpose of operating a railroad and provide for "reversion" of the property upon termination of railroad use. The grants of the railroad easement in *Towes*, like those in this case, contained express provision for reversion. The court stated,

> There was a provision in the grants that if the Railroad Company permanently discontinued the use of the railroad, the land and rights of way "shall at once revert to the undersigned' landowner. After evaluating the entire deeds of grant, the trial court held that these grants constituted easements and not fee simple transfers. This is undoubtedly correct, and on appeal neither party has challenged that holding.[57]

A subsequent Federal Circuit decision in *Hash v. United*[58] provided additional insight on the Courts' decisions in the *Preseault* cases. In *Hash*, the class of plaintiffs was comprised of approximately 200 successors to homesteaders who were granted land patents pursuant to the Homestead Act of 1862.[59] The plaintiffs' predecessors had conveyed easements to the Idaho Northern Railroad Co. to construct a right-of-way between 1899 and 1911.[60] However by 1995, the Railroad had been authorized by the ICC to discontinue part of its operation in Idaho, and later that year, the 83.1 mile longer former railroad corridor was converted into a trail.[61] For those class members who owned fee in their property, subject to the railroad easement, the Federal Circuit held,

---

[56] *Id.* at 1376-77.

[57] *Id.* *See*, Plaintiffs' Statement of Facts, *supra*, which describe the express terms of the instruments at issue in this case, which even more adamantly convey only an easement and preserve a "reversionary" right in the fee owner.

[58] 403 F.3d 1308 (Fed. Cir, 2005).

[59] *Id. at 1312*

[60] *Id.* at 1311.

[61] *Id.*

> On the railway's abandonment of its right-of-way these owners were disencumbered of the railway easement, and upon conversion of this land to a public trail, these owners' property interests were taken for public use, in accordance with the principles set forth in the *Preseault* cases.[62]

The Federal Circuit remanded the case back to the district court in order to determine the amount of just compensation due to those landowners.[63]

*ii. U.S. Court of Federal Claims Has Held that The Federal Government is Obligated to Pay "Just Compensation" in Similar Trails Act Taking Cases*

Similarly, this Court has held that property owners are entitled to "just compensation" for the taking of the Property when their state law "reversionary" rights are precluded or forestalled by the Trails Act.

*Glosemeyer v. United States*[64] involved three Missouri cases consolidated for decision on the question of the government's liability. In addition to the class of property owners in *Glosemeyer*, the decision included the claims of the class in *Moore v. United States* and the town of Grantwood Village in *Grantwood Village v. United States.*[65] In *Glosemeyer*, this Court considered and rejected the government's contention that under Missouri law, "railbanking" is a "railroad purpose" permitted within the scope of an easement for railroad use.[66] Florida law is the same as Missouri law on this issue.[67] In *Glosemeyer*, this Court rejected the government's argument that a public-access recreational trail was the same as a railroad. When considering the issue Florida courts agree. In fact, as we note below, Florida courts cite to precisely the same Missouri law and other authority as this Court did in *Glosemeyer*.

---

62 *Id.* at 1318.
63 *Id.*
64 45 Fed. Cl. 771 (2000).
65 95 F.3d 654 (1996).
66 *Id.* at 780.
67 We elaborate upon this point below.

In *Glosemeyer*, Judge Bruggink entered summary judgment against the government on the government's constitutional obligation to pay "just compensation" for taking the plaintiffs' property. Judge Bruggink described the relevant question as simply, "[h]aving established that the easements would have been extinguished, and thus that, but for the application of the Rails-to-Trails Act, the plaintiffs would have been seized of their lands without any restrictions, we have little difficulty concluding that a taking has occurred."[68] This same question is now before this court on the facts of this case.

In *Illig v. United States*,[69] this Court explained the nature of the easement imposed upon the owners' property. "What [the Trails Act] imposed on plaintiffs' land was a new easement which purported to preserve railroad use. The Trails Act was enacted in order to 'to preserve established railroad rights-of-way for future reactivation of rail service, [and] to protect rail transportation corridors."[70] Although this Court has found that interim trail use, or railbanking, was not a legitimate railroad purpose,[71] the government's stated intent in creating the Trails Act was to preserve railroad rights-of-way as they existed.[72] "Although interim trail use of the railroad corridor was authorized by the Trails Act through the NITU issued here, the use of the easement for trail purposes is subject to the future restoration of rail services."[73]

In other Trails Act taking cases, this Court has held that when property owners trace their chain of title to a homesteading statute, which conveyed title after the railroad had already acquired its right-of-way traversing public land, the property owner still held fee title and the

---

[68] *Id.* at 781.
[69] 58 Fed. Cl. 619 (2003).
[70] *Id.*; *see* 16 U.S.C. § 1247(d).
[71] *Glosemeyer v. United States,* 45 Fed.Cl. 771 (2000)
[72] *See* 16 U.S.C. § 1247(d) (stating that "if ... interim trail use is subject to restoration and reconstruction for railroad purposes, such interim use shall not be treated ... as an abandonment of the use of such rights-of-way for railroad purposes.")
[73] *Illig*, 58 Fed. Cl. at 629.

railroad held only an easement. The government did not retain fee to the property underlying the right-of-way. *Ellamae Phillips Co. v. United States*, 77 Fed. Cl. 387 (2007, Judge Baskir), *Blendu v. United States*, 75 Fed. Cl. 543 (2007, Judge Hewitt), *Beres v. United States*, 64 Fed. Cl. 403 (2005, Judge Horn). These three cases concern issues related to the nature of title transferred under land patents and addressed by the Federal Circuit in *Hash v. United States.*[74] In all three cases, this Court affirmed the principle that the Trails Act effects a compensable taking of a landowner's property when it precludes a property owner's state law reversionary right to their property.

*iii. U.S. District Courts in Trails Act Takings Claims Brought Under the "Mini-Tucker" Act Have Held the Defendant Liable to Pay Compensation for a Taking of Property.*

Federal district courts also have jurisdiction to consider Trails Act taking claims under the "Mini-Tucker Act."[75]

In *Schmitt v. United States*,[76] the court found that landowners adjoining an abandoned railroad right-of-way held fee title to property underlying a railroad right-of-way subject to the Trails Act. The court found that the railroad held only an easement and certified the matter as a class action. The court then granted the Plaintiff's motion for summary judgment and found the government liable for a taking of the Plaintiff's property for which "just compensation" was due. The court found, "[h]aving established that the easements would have been extinguished, and thus, but for the application of the Rails-to-Trails Act, the railroad corridor would have reverted back to the Plaintiffs in fee, the court finds that a taking under the Fifth Amendment has occurred."[77]

---

74 403 F. 3d 1308 (Fed. Cir. 2005).
75 28 U.S. C. § 1346 (a)(2).
76 203 F.R.D. 387 (S.D. Ind., 2001).
77 2003 WL 21057368, *8 (2003).

Similarly, in *Swisher v. United States*,[78] the court held, "under the Trails Act, the conversion from railroad use to trail use blocks the abandonment of the right-of-way even though conditions for abandonment under state law may otherwise be met. 'But for the negotiation of a trail use agreement, state property law would be revived and, possibly, trigger extinguishment of rights-of-way and the vesting reversionary interest.' In such circumstances, when a reversionary interest is blocked, the interim trail is deemed a taking. Accordingly, the holder of a reversionary interest that does not vest because of trail use (such as the plaintiffs in this case) is entitled to compensation."[79]

*d. A Taking of the Property Owner's Land Arises Upon Issuance of a NITU.*

The Federal Circuit in *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004), and *Barclay v. United States*, 443 F.3d 1368 (2006) considered an issue of first impression when the court sought to decide at what point a claim for a taking under the Trails Act accrued. The Federal Circuit held that a claim for compensation arises upon the STB issuing a NITU. Specifically, Judge Dyk of the Federal Circuit wrote,

> [t]he taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting. Abandonment is suspended and the reversionary interest is blocked 'when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)' of the Trails Act. We concluded that '[t]he issuance of the NITU is the only government action in the rail banking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right of way.' Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU.

[78] 176 F. Supp.2d 1100 (D. Kan, 2001).

[79] *Id.* at 1101-02, *citing*, *Nat'l Assoc. of Reversionary Property Owners v. Surface Transp. Bd.*, 158 F. 3d 135, 139 (D.C. Cir. 1998), *Preseault II*, at 1550, 1551 and *Glosemeyer v. United States*, 45 Fed. Cl. 771, 781 (2000).

*Barclay v. United States*, 443 F.3d 1368 (2006) (Judge Dyk cited his own prior decision in *Caldwell v. United States* as authority.) (certiorari denied by *Barclay v. U.S.*, 127 S.Ct. 1328 (U.S. Feb. 20, 2007) (No. 06-816)).

**B. The rights that property owners enjoy in their property are defined by state law.**

It is a long-settled point of law that "state law creates and defines the scope of the reversionary or other real property interests affected by the ICC's actions pursuant to the Trails Act." In *Preseault I*, the U.S. Supreme Court stated,

> In determining whether a taking has occurred, "we are mindful of the basic axiom that '[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001 (1984), *quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980) (internal quotation omitted). *** Determining what interest petitioners would have enjoyed under Vermont law, in the absence of the ICC's recent actions, will establish whether petitioners possess the predicate property interest that must underlie any takings claim. *See Ruckelshaus v. Monsanto Co.*, supra, at 1001-1004.

*Preseault I*, 494 U.S. at 20-21 (concurrence by Justice O'Connor joined by Justices Scalia and Kennedy); *see also*, *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972) (holding that "[p]roperty interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law).

**C. Under Florida law, a railroad easement is abandoned when the property is no longer used for a railroad purpose; a "railroad purpose" does not include a public-access recreational trail.**

Just as Justice Brennan observed in *Preseault I*, and the Florida Court of Appeals observed in *Davis v. MCI Telecommunications, Corp*,[80] the Seminole Gulf Railroad acquired only a conditional easement to use the Plaintiffs' property for operation of a railroad and did not

[80] 606 So. 2d 734 (Fla. App. 1992).

own fee title to the property. This fact is confirmed by conveyances made to the Seaboard back in 1910, and which are attached to the Proposed Findings of Uncontroverted Facts.[81]

For 132 acres of the 155 acre right-of-way, it is not necessary to spend great effort consulting Florida law. The crystal clear and express terms of the Palmer, Honore, and Webber easement instruments settle the issue. "[I]f at any time thereafter the said Seaboard Air Line Railway shall abandon said line for railroad purposes then the above described pieces and parcels of land shall *ipso facto* revert to and again become the property of the undersigned, his heirs, administrators and assigns."[82]

Game over. The railroad abandoned the property and the Plaintiffs – as the successor fee owners to Sarah O. Webber, Adrian C. Honore, and Potter Palmer, Jr. – own the property free of any easement for current or future railroad use. In the words of the easement to the Seaboard, the "land shall *ipso facto* revert to and again become the property of" the current fee owners as the assigns of the original fee owners. And, at no time was any of the property ever encumbered by any easement for a public-access recreational trail.

These express reverter provisions are like those considered by the Federal Circuit in *Towes*. "There was a provision in the grants that if the Railroad Company permanently discontinued the use of the railroad, the land and rights of way 'shall at once revert to the undersigned' landowner." *Towes*, 376 F.3d at 1376.

This express reverter clause in the Palmer, Honore, and Webber easements makes this case even more easily resolved than those cases involving railroad easements in *Glosemeyer, Grantwood Village, Hash,* or *Preseault II,* where the instrument itself did not contain an express "reversion" clause. In those cases involving railroad easements or licenses acquired by

---

[81] See discussion, *supra*, on pages 6-8, noting the terms of the conveyance instruments.
[82] See deeds, attached as Tabs 1-3.

condemnation decree, adverse possession or prescription or a general grant of an easement without a specific reverter clause, the court needed to consult state law to determine what interest was held by the railroad.

Florida law is similar to the state law at issue in *Preseault II*, *Glosemeyer*, and other Trails Act cases involving railroad easements that did not contain an express reverter clause. Long-established Florida law makes it unquestionably clear that – upon the CSX and SGLP's abandoning a railroad right-of-way – the Plaintiffs owned their property free of any easement for a railroad or for a public-access recreational trail. It is also settled Florida law that a railroad easement does not include (and cannot be expanded to include) the right to use property for a public-access hiking trail. Thus, even for those grants of a railroad easement that did not contain an express reversion clause, the easement was abandoned when a railroad was no longer operated across the property and the fee owners, under Florida law, enjoyed their land free and clear of any easement for either a public-access trail or a railroad.

1. <u>An Easement is not an estate in land but merely the right to use property for a specific purpose</u>.

Under long-established Florida law (as is the law in other jurisdictions), an easement is one of ***use*** and ***not an estate*** of the land. *Dean v. MOD Properties, Ltd.*, 528 So. 2d 432, 433-34 (Fla. App. 1988). Because an easement is not an estate in land the conveyance of an easement does not convey title to land or dispossess the owner of the land subject to the easement. Instead, an easement only grants the right to use the property for some particular purpose or purposes.[83]

The owner of an easement only possesses a right to use the property for that specific purpose and does not have any other interest in the land.

---

[83] *E.g.*, *Sears Roebuck and Co. v. Franchise Finance Corp. of America*, 711 So. 2d 1189, 1191 (Fla. App. 1998); *Easton v. Appler*, 548 So.2d 691 (Fla. App. 1989); *Dean*, 528 So.2d at 432; *Kempfer v. St. Johns River Water Management Dist.*, 475 So.2d 920 (Fla. App. 1985); *Hayes v. Reynolds*, 132 So.2d 781 (Fla. App. 1961).

2. The terms of an easement are governed by the unambiguous intention of the parties.

"[N]o particular form and language are necessary to create an easement; rather, any words clearly showing the intention of the parties to create a servitude on a sufficiently identifiable estate is sufficient." *Hynes v. City of Lakeland*, 451 So. 2d 505, 511 (Fla. App. 1984). Courts should give meaning and affect to every unambiguous provision of an easement. *American Real Estate Holding Limited Partnership v. Twin Cities Investors, Inc.*, 740 So. 2d 562 (Fla. App. 1999); *Shiner v. Baita*, 710 So. 2d 711 (Fla. App. 1998)(language in deed that grantee shall have right to terminate grantor's right to hook up to septic tank on grantee's property upon paying the expenses to construct a septic tank on grantor's property was clear and unambiguous). Furthermore, it is error for a court to go beyond the four corners of an easement grant when the terms granting the easement are unambiguous.[84]

The Federal Circuit in *Preseault II* applied these same principles to the easement at issue in that case:

> [R]ecognizing as we must that Vermont follows and applies common law property principles. The easements involved here are express easements, meaning that the scope of the easements are set out in express terms, either in the granting documents or as a matter of incorporation and legal construction of the terms of the relevant documents. "The extent of an easement created by a conveyance is fixed by the conveyance." 5 Restatement of Property § 482 ([A.L.I. ed.] 1944).

[84] Conveyance of a strip of land to a railroad – even when in the form of a general warranty deed – conveys only an easement for railroad purpose. It is a general principle of law in most jurisdictions that the conveyance of a strip of land to a railroad company for a right of way does not vest an absolute title in the railroad company even if conveyance instrument is in the form of a general warranty deed. *Love v. U.S.*, 889 F. Supp. 1548, 1580-81 (E.D.N.C. 1994); *Drazich v. Lasson*, 964 P.2d 324, 327 (Utah App. 1998); *Huff v. Langman*, 646 N.E.2d 730 (Ind. App. 1995); *Harvest Queen Mill & Elevator Co. v. Sanders*, 370 P.2d 419 (Kan. 1962). The interest conveyed, particularly when conveyed to a railroad, is limited by the use for which the land is acquired. Thus, even when a deed purports to convey land to a railroad in the form of a general warranty deed, when the railroad abandons the easement, by ceasing to use it for railroad purposes, the property will revert to the adjoining owner. *Love*, 889 F. Supp. at 1580-81; *Drazich*, 964 P.2d at 327 (Utah App. 1998); *Huff*, 646 N.E.2d at 730 ; *Harvest Queen* 370 P.2d at 419.

> In a leading treatise on the subject, the authors state the general rule to be "[w]hen precise language is employed to create an easement, such terminology governs the extent of usage." Jon. W. Bruce and James W. Ely, Jr., The Law of Easements and Licenses in Land ¶ 8.02[1], at 8-3 (rev. ed. 1995)."

*Preseault II*, 100 F.3d at 1542.

3. The easement holder may only use the property for the specific purpose designated in the grant of the easement

Where the grant of an easement "specifically states the uses or purposes for which the easement was created, the use of [the] easement must be confined strictly to the purposes for which it was granted or reserved and it cannot be enlarged by any change in the use or character of the dominant estate."[85]

When the intent of the grantor is clear, effect must be given to that intent.[86] In the present case, the clear intent of the parties that established the Seaboard railroad right-of-way in 1910 was to make a limited grant of the right to use the property for the purpose of operating a railroad.

As the Florida Court of Appeals noted in *Davis v. MCI*, 606 So 2d 734, 738 (Fl. App., 1992), "Except to site a station house or similar land use here and there, the railroads had no need or desire for any interest except 'right-of-way.'"

4. An easement holder may not increase the burden upon the property.

An easement holder may not increase the burden on the land created by the easement. There is "an implied right to do what is necessary for the full enjoyment of the easement itself

---

[85] *Walters v. McCall*, 450 So.2d 1139 (Fla. App. 1984); *see also Ackers v. Canas*, 601 So.2d 305, 306 (Fla. App. 1992).

[86] *Pathare*, 602 So.2d at 1346; *Saltzman*, 306 So.2d at 539; *Clear Channel Metroplex, Inc. v. Sunbeam Television Corp.*, 922 So.2d 229, 232 (Fla. App. 2005); *see also Moore v. Stevens*, 106 So. 901, 903 (Fla. 1925) ("Such covenant are strictly construed in favor of the free and unrestricted use of real property, but effect will be given to the manifest intention of the parties.").

accompanies every easement, but that such right is limited and must be exercised in a reasonable manner so as not to injuriously increase the burden upon the servient estate."[87]

An increase in burden on the fee holder includes any new or different uses not contemplated by the grantor when the easement was created. *Loveland v. CSX Transp., Inc.*, 622 So.2d 1120, 122 (Fla.App. 1993) (citing *Lawson v. State*, 107 Wash.2d 444, 730 P.2d 1308 (1986) (holding that the sale of railroad right-of-way to the county for use as hiking trail was not used for railroad purpose and it constituted abandonment); *Seventy-Ninth Street Improv. Corp. v. Ashley*, 509 S.W.2d 121, 123 (Mo.1974) (holding that "[a]n offer to sell [right-of-way for use other than that for which is granted] is totally inconsistent with any position other than that the use of the strip for railroad purposes has been abandoned."). In *Loveland*, the Florida Court of Appeals held that a railroad could not sell a portion of property, in which it held only and easement, to a sandblasting and painting company and retain the easement. *Id.* at 1121-23. We discuss *Loveland* in greater detail below.

5. <u>A Railroad easement is extinguished and abandoned when the property is conveyed to a non-railroad or used as a hiking trail</u>.

Use of a railroad easement for a hiking trail extinguishes and abandons the railroad's easement. *Loveland,* 622 So.2d at 1121-23. In *Loveland*, the Florida Court of Appeals examined the law of several jurisdictions and found it to be in agreement with Florida law on this general principle:

> The first question is whether any part of the property was abandoned or no longer used for railroad purposes because "the property [has] actually been alienated by sale or lease." [*Marthens v. B & O Railroad*, 170 W.Va. 33, 289 S.E.2d 706, 710 (1982).] If property is sold, it can no longer be used for railroad purposes unless it is conveyed to someone who will use the land for railroad purposes. *Id. See, e.g., Cannco Contractors Inc. v. Livingston*, 282 Ark. 438, 669 S.W.2d 457 (railroad deeding of right-of-way constituted abandonment), modified, 282 Ark.

[87] *Walters v. McCall*, 450 So. 2d 1139, 1142-43 (Fla. App. 1984); *Davis v. MCI Telecommunications Corp.*, 606 So. 2d 734 (Fla. App. 1992).

438, 670 S.W.2d 454 (1984); *Lawson v. State*, 107 Wash.2d 444, 730 P.2d 1308 (1986) (***sale of railroad right-of-way to county for use as hiking trail was not used for railroad purpose, and it constituted abandonment***); *Seventy-Ninth Street Improv. Corp. v. Ashley*, 509 S.W.2d 121, 123 (Mo.1974) ("An offer to sell [right-of-way for use other than that for which is granted] is totally inconsistent with any position other than that the use of the strip for railroad purposes has been abandoned.").[88]

In *Loveland*, a successor railroad sold a portion of a railway to a sandblasting and painting company.[89] The court cited to other states' case law for the proposition that selling an easement means it cannot be used for the purpose it was originally granted for (unless sold to another railroad for the operation of a railroad).[90] Particularly, the court cited as authority those cases expressly holding that use of a former railroad easement as a recreational trail is an abandonment of the original railroad easement.[91] "[O]nce the parcels of property were sold the reversion clause was triggered."[92]

The Federal Circuit has likewise noted that "[m]ost state courts that have been faced with the question of whether conversion to a nature trail falls within the scope of an original railroad easement have held that it does not." *Preseault II*, 100 F.3d at 1543; *see also, Pollnow v. Department of Natural Resource*, 276 N.W. 2d 738 (1979) (holding that recreational trail use was not within the scope of a railroad right-of-way easement); *Schnabel v. County of DuPage*, 428 N.E.2d 671 (1981); *Glosemeyer v. United States,* 45 Fed. Cl. 771 (2000); *National Wildlife Fed'n v. ICC*, 850 F.2d 694 (D.C.Cir.1988) (rejecting ICC argument that rails-to-trails conversions will never constitute a taking, and remanding for further consideration especially regarding easements limited to railroad use and when railroad restoration "not foreseeable").

---

[88] *Id.* at 1122 (emphasis added)
[89] *Id.* at 1121.
[90] *Id.* at 1122.
[91] *Id.*
[92] *Id.* at 1123.

When a railroad abandons its easement for railroad purposes, the land is no longer subject to an easement or license for use of the property for operation of a railroad right of way. *Loveland*, 622 So.2d at 1122-23.

6. An easement may be abandoned, extinguished or forfeited.

It is well-settled law that where only an easement is taken for a right of way, and the use for such purpose ceases, the right to possession reverts to the original landowner or his successors in interest. *Wiggins v. Lykes Bros.*, 97 So.2d 273, 276 (Fla. 1957); *see also e.g.*, *Glosemeyer v. U.S.*, 45 Fed. Cl. 771 (2000); *Nature Conservancy v. Kolb*, 853 S.W.2d 864 (Ark. 1993). When an easement is thereby abandoned, the land does not go to grantees and successors in interest of the easement holder (herein, the railroad company). *Loveland v. CSX Transp., Inc.*, 622 So.2d 1120, 1121-23 (Fla.App. 1993). This rule is applied whether the easement was acquired by purchase (*Loveland*, 622 So.2d at 1122), condemnation, or adverse possession (*Wiggins*, 97 So.2d at 276).

In *Wiggins v. Lykes Bros.*,[93] the Florida Supreme Court dealt with an easement for grazing land. The Court noted that an easement can be abandoned when there is an adverse use on the part of somebody other than the easement holder combined with nonuse by the easement holder.[94] Wiggins also noted that an easement by prescription can be abandoned by mere nonuse.

7. When a railroad easement is abandoned, the underlying property owners enjoy the property free of any easement.

The Federal Circuit in *Preseault II* noted that, "[t]he usual way in which such an easement ends is by abandonment, which causes the easement to be extinguished by operation of

[93] 97 So.2d 273 (Fla. 1957).
[94] *Id.* at 276.

law."[95] The *Preseault II* court held that, upon an act of abandonment, the then owner of the fee estate is relieved of the burden of the easement.[96] In most jurisdictions, the reversion is automatic upon abandonment.[97]

As noted by the Florida Court of Appeals in *Loveland*, Florida law is in accord with the law summarized by the Federal Circuit in *Preseault II*. By selling an easement to a non-railroad, the easement can no longer be used for the purpose for which it was originally granted.[98] "[O]nce the parcels of property were sold the reversion clause was triggered… ."[99] Thus, under Florida law, upon the abandonment of a railroad easement, as occurred herein (and especially the sale to the Trust for Public Land) the property automatically reverts, unburdened by the easement, to the fee holders of the property.

**D. When the Trails Act precludes a property owner from enjoying that owner's "reversionary" right to property, which the owner enjoys under state law, it is a *per se* taking of that property owner's land for which the Fifth Amendment requires the federal government to pay "just compensation".**

1. <u>When the Trails Act precludes a property owner's "reversionary" right to property, it is a taking that requires payment of "just compensation" to the property owner</u>.

This area of law is settled beyond dispute. As the U.S. Supreme Court held in *Preseault I*, "if the rails-to-trails statute gives rise to a taking, compensation is available to petitioners under the Tucker Act…and the requirements of the Fifth Amendment are satisfied."[100] Justice Plager, of the Federal Circuit, later commented on the Supreme Court's holding,

> [i]t is elementary law that if the Government uses (or authorizes the use of-a point to be considered later) an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken

---

95 100 F.3d at 1543 (citing Restatement of Property § 504).
96 *Id.*
97 *Id.*
98 *Loveland,* 622 So.2d at 1122.
99 *Id.* at 1123.
100 494 U.S. at 4 (citation omitted).

the landowner's property for the new use. The consent of the railroad to the new use does not change the equation – the railroad cannot give what it does not have.[101]

2. Precluding a property owner's "reversionary" rights to use and enjoy their property and imposing further burdens on the property for an easement for a public-access recreational trail, as well as a future easement for railroad use, is a substantial *per se* physical taking of that property owner's property.

The Plaintiffs add their voice to the chorus lauding the noble goals of Congress in passing the 1983 Trail Act Amendments preserving abandoned railroad right-of-ways for public hiking and biking trails for the benefit of greater society. This, however, as Justice Bruggink noted *infra*, "is immaterial." When property owners' land is taken for the benefit of society as a whole, they are entitled to "just compensation." As Justice Bruggink explained,

> The likelihood that the Rails-to-Trails Act was motivated by a commendable interest in public recreation or was an exercise in great foresight is immaterial. Rights in private property are more durable than the current majority's notion of what constitutes a worthy cause. As Justice Holmes said in *Pennsylvania Coal Co. v. Mahon,* "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." 260 U.S. 393, 416, 43 S.Ct. 158, 67 L.Ed. 322 (1922). *See also Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (the "Fifth Amendment's guarantee ... [is] designed to bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.").[102]

The Supreme Court noted that even though Congress possesses eminent domain authority by which to accomplish this taking of Plaintiffs' property, the taking is not free of the government's constitutional obligation to pay "just compensation" to the Plaintiffs.

As Justice Plager wrote for the Federal Circuit in *Towes v. United States*, "[t]he Government has the legal power and is thus free to impose such new uses upon the fee interests

[101] *Toews*, 376 F.3d at 1376.
[102] *Glosemeyer*, 45 Fed.Cl. at 782

held by the adjacent landowners. But the private property interests taken are not free; the Government must pay the just compensation mandated by the Constitution."[103]

The protection of an individuals' right to their property is a foundational concept upon which our Republic is formed. It finds expression in the Fifth Amendment which succinctly provides, "private property [shall not] be taken for public use, without just compensation." The Fifth Amendment did not spring out of the ether. The protection of an individuals' right to own and use their property – land especially – is a fundamental hallmark of political liberty. One of the most fundamental aspects of property ownership is the right to exclude others. In *Kaiser Aetna et al. v. United States*, 444 U.S. 164 (1979) the Supreme Court wrote, "[W]e hold that the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation. This is not a case in which the Government is exercising its regulatory power in a manner that will cause an insubstantial devaluation of petitioners' private property; rather, the imposition of the navigational servitude in this context will result in an actual physical invasion of the privately owned marina. And even if the Government physically invades only an easement in property, it must nonetheless pay just compensation. See *United States v. Causby*, 328 U.S. 256, 265 (1946); *Portsmouth Co. v. United States*, 260 U.S. 327 (1922). At 180. (Several other citations omitted) (Citing for additional authority at footnote 11, "As stated by Mr. Justice Brandeis, '[a]n essential element of individual property is the legal right to exclude others from enjoying it.' *International News Service v. Associated Press*, 248 U.S. 215, 250 (1918)).

In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), Justice Marshall, writing for the Court, said: "We affirm the traditional rule that a permanent physical

---

[103] *Toews*, 376 F.3d at 1279.

occupation of property is a taking. In such a case, the property owner entertains a historically rooted expectation of compensation...." *Loretto*, 458 U.S. at 441. (Cited by Federal Circuit in *Preseault II* at 1540.)

The Supreme Court has recognized the right to exclude as a fundamental feature of property ownership. *See Boyd v. U.S.,* 116 U.S. 616, 630 (1886) *quoting*, *Entick v. Carrington 19 Howell's State Trials 1029*, 95 Eng. Rep. 807 (C.P. 1765), and adopted by U.S. Supreme Court in *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) and *United States v. Lefkowitz*, 285 U.S. 452, 466 (1932). *See also Silverman v. United States*, 365 U.S. 505, 511 – 512 (1961).

The right to exclude others is important in the context of Trails Act takings because the Trails Act not only "forestalls" or "precludes" a property owner from enjoying their state law "reversionary" right to their property but it also imposes two new servitudes upon the owners' property. The first new easement for a public-access recreational trail and the second is a new easement for potential future railroad use. Both of these are a *per se* physical taking of the owners' property. The owners' property is now subject to a right of the general public to physically occupy and use the property for a recreational trail as well as a future possibility of a railroad being built on the property. This is a very substantial *per se* physical intrusion into an owner's property.

## V. CONCLUSION

We began this memorandum by noting that summary judgment can be entered against the federal government on the basis of four points of uncontested fact and four settled principles of law. This motion presents this court with precisely the same question that a similar motion presented Judge Bruggink in the Missouri cases of *Glossmeyer*, *Grantwood Village*, *Moore*, and *Illig*. It presents this court with the same question presented to the Federal Circuit in *Towes, Hash* and *Preseault II*. We are not asking this Court to plow new ground. The law and facts are settled.

Namely, in Judge Bruggink's straightforward formulation, "[h]aving established that the easements would have been extinguished, and thus that, but for the application of the Rails-to-Trails Act, the plaintiffs would have been seized of their lands without any restrictions, we have little difficulty concluding that a taking has occurred."

As we have demonstrated above, a similar result lies in this case. The Defendant, by operation of the Trails Act, has taken the Plaintiffs' property. The Fifth Amendment requires that the federal government pay the Plaintiffs "just compensation" for this taking. This entry of partial summary judgment rests upon uncontroverted facts and settled law.

The Plaintiffs request that this Court enter judgment against the Defendant on the issue of the Defendant's obligation to pay "just compensation" to the Plaintiffs for the taking of the Plaintiff's property. The Plaintiffs further request that this court order this case to proceed to determining the value of the property that has been taken from the Plaintiffs.

| | |
|---|---|
| Date: March 26, 2008 | LATHROP & GAGE L.C.<br><br>By /s/ Mark F. (Thor) Hearne, II<br>MARK F. (THOR) HEARNE, II<br>LINDSAY S.C. BRINTON<br>MEGHAN S. LARGENT<br>10 South Broadway, Suite 1300<br>St. Louis, MO 63102-1708<br>(314) 613-2500<br>(314) 613-2550 (fax)<br>Thornet@ix.netcom.com<br><br>ATTORNEYS FOR PLAINTIFFS |